UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———————————————

SAMUEL R. MOORE, JR. and
CAROLYN A. MOORE,

        Plaintiffs,

v.                                            Case No. 1:04-CV-800

CYCON ENTERPRISES, INC.,                HON. GORDON J. QUIST

        Defendant and
        Third-Party Plaintiff.

v.

B & P GROUP, INC.,

        Third-Party Defendant.

——————————————————/

## OPINION

### I. Background

Plaintiffs, Samuel R. Moore, Jr. and Carolyn A. Moore (the "Moores"), filed their complaint

in this case on November 30, 2004, against Defendants Cycon Enterprises, Inc. ("Cycon"), B & P

Group, Inc. ("B & P"), Romar Financial, L.L.C. ("Romar"), Ronald A. Peltz ("Peltz"), Marian A.

Rupright ("Rupright"), and Palmer Home Mortgage, Inc. ("Palmer").  The Moores alleged seven

claims in their complaint:  violation of the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*

(Count 1); violation of the Home Ownership and Equity Protection Act of 1994 ("HOEPA"), 15

U.S.C. §§ 1602(aa) and 1639 (Count 2); violation of the Real Estate Settlement Procedures Act of

1974 ("RESPA"), 12 U.S.C. § 2601, *et seq.* (Count 3); violation of the Michigan Consumer

Protection Act ("MCPA"), M.C.L.A. § 445.901, *et seq.* (Count 4); violation of the Michigan Usury

Statute, M.C.L.A. § 438.31, *et seq.* (Count 5); common law fraud (Count 6); and violation of the Michigan Credit Services Protection Act ("MCSPA"), M.C.L.A. § 445.1821, *et seq.* (Count 7).

On March 21, 2005, the Court entered three Orders which: (1) dismissed all claims against Palmer; and (2) dismissed Counts 4 and 6 against Cycon and B & P.  On March 31, 2005, the Court entered an Order dismissing certain claims and defendants.  In particular, the Court: (1) granted B & P's motion to dismiss the Moores' claims against it; (2) granted Cycon's motion to dismiss Counts 3, 4, and 6; (3) granted Palmer's motion to dismiss Cycon's cross-claim; and (4) dismissed as moot B & P's and Cycon's motions to dismiss Palmer's cross-claims against them.  The Court noted that the only claims remaining in the case were Counts 1, 2, 5, and 7 against Cycon, and Counts 3, 4, 6, and 7 against Peltz, Rupright, and Romar, and that Cycon's counter-claim against the Moores and its cross-claims against B & P and Peltz, and Palmer's third-party complaint against Lorne Dean Sundrla also remained.  On April 12, 2005, the Court entered an Order dismissing Peltz, Rupright, and Romar, without prejudice, based upon the Moores' failure to serve them, and on April 21, 2005, the Court entered an Order approving a stipulation between Palmer and Lorne Dean Sundrla for the dismissal of all of Palmer's third-party claims against Sundrla.  Thus, the only claims remaining in the case are Counts 1 (TILA), 2 (HOEPA), 5 (violation of the Michigan usury statute), and 7 (MCSPA) of the Moores' complaint against Cycon; Cycon's counter-claim against the Moores; and Cycon's cross-claims against B & P, which was realigned as a third-party defendant pursuant to the August 10, 2005, Case Management Order.

Presently before the Court are the Moores' motion for partial summary judgment, in which they seek summary judgment on their TILA, HOEPA, and usury claims, Cycon's motion for summary judgment regarding all of the Moores' claims and summary judgment on its counter-claims

2

against the Moores, and B & P's motion for summary judgment on Cycon's third-party claims.  For the reasons set forth below, the Court will grant the Moores' motion and deny Cycon's motion.  The Court will also grant B & P's motion and dismiss Cycon's third party complaint.

## II.  Facts

The Moores are both high school graduates.  Mr. Moore is a welder by trade but became permanently disabled in July of 2004, as a result of a heart attack.  Mrs. Moore is unable to work outside of the home due to her diabetes, asthma, and other medical conditions.

In 1997 or 1998, the Moores purchased a vacant piece of land consisting of approximately 7.8 acres in Montague, Michigan as a site for a new home.  The property had an address of 51 West Skeels Road.  In 1998, the Moores hired a builder to construct a home in a period of months.  The Moores obtained a loan in the amount of $174,500 to pay for the construction.  Soon after construction began, the Moores ran into financial difficulty due to problems with the builder and family matters.  The builder finally completed the house in November 1999.  After the home was completed, the Moores refinanced their construction loan through Option One Mortgage.  The Moores' monthly payment under the mortgage was $1,919.77.  Ultimately, the Moores did not recover from their financial problems, and they fell behind on their mortgage payments.  On February 7, 2003, their house was sold at a mortgage foreclosure sale.  The Moores had until August 7, 2003, to redeem the property by paying off the $190,012.15 mortgage balance (plus a foreclosure fee of $250).

On or about February 13, 2003, shortly after information regarding the foreclosure of the Moores' property had been published, the Moores received a letter from Peltz stating that he could obtain financing for the Moores and prevent them from losing their home in foreclosure.  Peltz

enclosed a copy of his business card, which indicated that he worked for Palmer. The Moores decided to follow up on the letter and subsequently met with Peltz in April 2003 at a restaurant in Grand Rapids. Peltz told the Moores that he could arrange financing for them that would prevent them from losing their house. He also told them that initially, they would have to pay a high interest rate but could refinance in six to eight months at a better rate if they made their payments on time. The Moores decided to refinance through Peltz. Thereafter, Peltz never represented to the Moores that the transaction would involve anything other than a refinancing of their current mortgage.

In approximately May of 2003, Pete St. John ("St. John") of B & P mortgage contacted Howard "Buddy" Windham ("Windham") of Cycon regarding the possibility of investing in the Moores' residential property. (Windham Dep. at 35-36.) Windham owns or has owned several businesses, including a company known as L & B Investors, LLC ("L & B"). Windham is the sole member of L & B, and he uses that entity to invest in real estate. Windham's wife is sole owner of Cycon, although Windham is the president, CEO, and only employee of Cycon. (Id. at 10.) Windham also administers the Cycon profit sharing plan. (Id. at 11.) Windham met St. John sometime in 2002 through Cycon's former bonding agent and, prior to the transaction involving the Moores' property, Windham had either considered or engaged in other real estate investments that St. John had proposed.[1] (Id. at 35-36.)

When St. John contacted Windham regarding the Moores' property, he said that it was "16 plus acres, 2500 square [feet] or so of home, that from what he could see it was a nice home," and "he asked [Windham] if [he] would be interested in taking a mortgage on it." (Id. at 50.) St. John

---

[1] Windham testified that he or his related entities (L & B or Cycon) engaged in approximately four transactions involving mortgage foreclosures that were offered through B & P, including the transaction involving the Moores' property. (Id. at 37.) Although Windham did not acquire his ownership interest in L & B until 2005, (id. at 25), he was involved in its operations prior to that time. (Id. at 31.)

subsequently told Windham that he learned of the investment opportunity through Peltz. Windham expressed an interest in the property and asked St. John for an appraisal. St. John provided Windham a copy of an appraisal by Fox Appraisal Services, dated February 14, 2003, which stated that as of November 28, 2002, the fair market value of the Moores' property was $307,900.00. (Id. at 52-53.) Windham took the appraisal with him when he conducted an inspection of the Moores' property. Windham never discussed the transaction with the Moores or Peltz. His only contact with the Moores was an exchange of pleasantries during his inspection of their property (and, subsequently, a brief exchange at the title company on the morning of the closing as Windham was leaving after having dropped off Cycon's check). Ultimately, Windham decided to engage in the transaction through the Cycon profit sharing plan.

At some point prior to the closing, Peltz had the Moores sign a form residential purchase agreement in which they agreed to sell their property to the Cycon profit sharing plan for $215,000 and Cycon agreed to lease the property back to the Moores with an option to repurchase the property. Peltz conducted the loan closing on June 11, 2003, at Unified Title & Settlement Group, LLC. During the closing, Peltz continued to state that the transaction was a refinancing. (Samuel Moore Aff. ¶ 17; Carolyn Moore Aff. ¶ 17.) He told the Moores that he had cut his commission in order to get their refinancing to go through and had them pay him an additional $850 for his efforts. (Samuel Moore Aff. ¶ 16; Carolyn Moore Aff. ¶ 16.) Although Peltz did not tell the Moores that they were selling their property, he had them sign a warranty deed, which conveyed their property to Cycon's profit sharing plan. In addition, Peltz had the Moores sign a lease-back of their property, with an option to repurchase it. Among other things, the lease required the Moores to: (1) pay monthly rent in the amount of $2515; (2) pay all real estate taxes, assessments, water charges, and

other amounts assessed or imposed against the property; (3) maintain fire and extended coverage insurance on the property and all improvements; (4) maintain general public liability insurance protecting Cycon against claims and damages; and (5) pay for the maintenance and repair of the well and septic systems, as well as for other items such as sinks, toilets, and the garbage disposal.

Peltz gave the Moores a HUD-1 settlement statement which showed that the Moores paid settlement charges totaling $25,430. B & P received $12,930 of this amount as a "Loan Origination Fee" and $350 as an "Underwriting Fee," and Romar (Peltz) received $9,420 as an "Additional Settlement Charge." As part of the transaction, the Cycon profit sharing plan used its funds to pay off the mortgage debt to Wells Fargo Bank. Thus, as the transaction was structured, there was no loan to the Moores. The Moores did not receive TILA cost-of-credit disclosures or recision forms and disclosures, nor did they receive any cash from the transaction. Following the closing, Cycon recorded the warranty deed with the Muskegon County Register of Deeds.

Although the Moores had the opportunity to review the closing documents before signing them, they chose not to do so. (Samuel Moore Dep. at 88-89.) Samuel Moore indicated that he "was under the impression that [he] was signing some refinancing papers" and "was too glad to try to do a refinancing to be questioning anybody about anything." (Id. at 115.)

The Moores subsequently filed a Chapter 7 bankruptcy petition after they fell behind in their monthly payment of $2,515 to Cycon. The Moores claim that they first learned that the transaction with Cycon was a sale-leaseback rather than a refinancing as they had been led to believe when they presented their paperwork to their bankruptcy attorney. (Samuel Moore Aff. ¶ 25; Carolyn Moore Aff. ¶ 25.) Schedules A and G of the Moores' bankruptcy schedules stated that the Moores had transferred their residence to Cycon on June 11, 2003, and that they were leasing it from Cycon. In

6

Schedule B, the Moores' attorney listed as an asset a "Claim for fraud and conversion against Unified Title & Settlement Group, LLC, Romar Financial and other parties whose identity is yet undetermined," having a value greater than $24,000.  On December 8, 2003, the Moores' counsel in this action wrote to the bankruptcy trustee to request that the trustee abandon the claim.  He explained the claim as follows:

> The lawsuit will be based upon the Truth in Lending Act, 15 USC 1601 *et seq.*, the Michigan civil usury statute, the Michigan Consumer Protection Act and common law fraud.  The legal theory will be that the transaction was merely an equitable mortgage.  The TILA was violated because the Moores were given no cost of credit disclosures as required by the TILA, thus entitling them to statutory damages of $2,000.00 along with the option to rescind the mortgage.  Further, the loan clearly was usurious because the difference between the true amount of the loan ($190,012.15) and the repurchase price after one year ($224,120.00) resulted in a finance charge of $34,107.85 for the one-year period.  Under Michigan law, the maker of a usurious loan is prohibited from collecting any interest charge in connection with the loan.  Thus, if successful, the Moores would be left with ownership of their home, a mortgage of $190,012.15 that is interest-free for the short term, and (hopefully) the ability to refinance.  Finally, I will attempt to have the court void the bogus charges made by B & P Group and Romar Financial (presumably, Cycon would have to cross-claim against those entities to recover its loss for those charges).

(Letter from Rogers to Porter of 12/8/03 at 2-3.)

By notice dated July 23, 2004, the bankruptcy trustee abandoned the claim, stating that "[t]he measure of damages, should they prevail, would be to restore their ownership interes[t] in their home subject to the pre-existing mortgage but would not produce anything that would result in a benefit to their creditors."  By letter dated September 24, 2004, the Moores' attorney advised Cycon that the Moores were exercising their right under 15 U.S.C. § 1635(a) to rescind the transaction and demanded that Cycon file appropriate documents with the register of deeds to terminate any security interest it had in the Moores' property.  The Moores filed this action after Cycon refused to do so.

Since the filing of the bankruptcy case, the Moores have continued to occupy the property but have not paid rent to Cycon, nor have they paid the property taxes or the insurance.

### III.  Motion Standard

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56.  Material facts are facts which are defined by substantive law and are necessary to apply the law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  A dispute is genuine if a reasonable jury could return judgment for the non-moving party.  *Id*.

The court must draw all inferences in a light most favorable to the non-moving party, but may grant summary judgment when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986)).

### IV.  Discussion

As mentioned above, all parties have filed motions for summary judgment.  The Moores seek partial summary judgment on their TILA and HOEPA claims, as well their claim under the Michigan usury statute.  Cycon seeks summary judgment on all of the Moores' claims as well as on its counter-claim against the Moores for breach of the lease agreement.  As the Court sees it, the primary issues between the Moores and Cycon are: (1) whether the Moores are judicially estopped, based upon their representations and conduct in their bankruptcy case, from asserting their claims in this case; and (2) whether the transaction was actually a sale or, under the equitable mortgage doctrine, was actually a loan.  A third issue that arises only if the Moores win on the first two issues is whether, for

purposes of the MCSPA claim, Cycon made any misrepresentations to the Moores. Finally, in its motion for summary judgment on Cycon's third-party claims for promissory estoppel and misrepresentation, B & P argues that Cycon's third-party claims must be dismissed because B & P did not make any representations or promises to Cycon regarding the Moores' understanding of the nature of the transaction or regarding the acreage of the Moores' property.

**A.     The Moores' and Cycon's Motions For Summary Judgment**

   **1.     Judicial Estoppel**

Cycon contends that it is entitled to summary judgment on the Moores' claims based upon the doctrine of judicial estoppel. The Supreme Court has described the doctrine as follows: "'[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him.'" New Hampshire v. Maine, 532 U.S. 742, 749, 121 S. Ct. 1808, 1814 (2001) (quoting Davis v. Wakelee, 156 U.S. 680, 689, 15 S. Ct. 555, 558 (1895)). The Sixth Circuit has "stressed that the doctrine of judicial estoppel is utilized in order to preserve 'the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship.'" Browning v. Lew, 283 F.3d 761, 776 (6th Cir. 2002) (quoting Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1218 (6th Cir. 1990)). In more common parlance, the doctrine has been alternatively described as a rule against "playing fast and loose with the courts," "blowing hot and cold as the occasion demands," or "hav[ing] [one's] cake and eat[ing] it too." Reynolds v. Commissioner, 861 F.2d 469, 472 (6th Cir. 1988) (internal quotations omitted). While there is no precise rule for determining when the doctrine should bar a litigant from maintaining a particular position, courts

generally require a showing that the party to be estopped took a contrary position under oath in a prior proceeding and that the position was accepted by the court.  See Teledyne Indus., 911 F.2d at 1218 ("In order to invoke judicial estoppel, a party must show that the opponent took a contrary position under oath in a prior proceeding and that position was accepted by the court."); Ladd v. ITT Corp., 148 F.3d 753, 756 (7th Cir. 1998) (noting that the purpose of the doctrine "is to reduce fraud in the legal process by forcing a modicum of consistency on a repeating litigant").  In New Hampshire v. Maine, supra, the Court identified three considerations that are generally relevant in determining whether the doctrine should apply: (1) "a party's later position must be clearly inconsistent with its earlier position"; (2) "whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."  Id. at 750-51, 121 S. Ct. at 1815.

As Cycon correctly notes, courts have applied judicial estoppel in the bankruptcy context based upon misstatements or omissions in bankruptcy schedules or disclosure statements.  See Reynolds, 861 F.2d at 474 (noting that "courts have held statements or omissions by a debtor in a disclosure statement sufficient for a finding of judicial estoppel"); De Leon v. Comcar Indus., Inc., 321 F.3d 1289, 1291 (11th Cir. 2003) (holding that the plaintiff was judicially estopped to pursue a Title VII claim where he failed to amend his bankruptcy filing to add his lawsuit as a potential asset, and the fact that plaintiff sought to amend his filing only after the defendant relied on the bankruptcy omission as a basis for judicial estoppel in its motion to dismiss the Title VII case did not show that the omission was inadvertent).  Cycon contends that the Moores should be judicially

estopped from asserting their claims in this case based upon statements they made in their prior bankruptcy filings that they transferred the property to Cycon on June 11, 2003, and were leasing it from Cycon, as well as their omission of Cycon as a secured creditor. Cycon further contends that the Moores should be estopped because they were well aware of the underlying factual basis for their claims during the pendency of the bankruptcy proceeding and failed to disclose their claims as an asset. Cycon further notes that the Moores had a motive to conceal their claims because any monetary award that they recovered in excess of their exemption would have gone to the estate. In support of its argument, Cycon cites <u>Tennyson v. Challenge Realty</u> (<u>In re Tennyson</u>), 313 B.R. 402 (Bankr. W.D. Ky. 2004). In that case, the bankruptcy court held that the plaintiffs were precluded from asserting TILA and HOEPA claims seeking, among other things, rescission of their mortgage, based upon the alternative grounds that the claims were property of the bankruptcy estate and had not been abandoned by the trustee and that the claims were barred by judicial estoppel. The plaintiffs had filed an amendment to their schedules which added a TILA claim in the amount of $2,000 and also indicated that the defendant should be listed as an unsecured creditor rather than a secured creditor, but the amendment did not identify a rescission claim. The plaintiffs received their discharge, and several years later, they filed an adversary proceeding seeking rescission of the mortgage and other relief. With regard to the issue of judicial estoppel, the court, citing the Fifth Circuit's decision in <u>In re Coastal Plains, Inc.</u>, 179 F.3d 197 (5th Cir. 1999), stated that a debtor's failure to disclose a potential lawsuit in a bankruptcy proceeding may be deemed inadvertent, and, therefore, insufficient to support the application of judicial estoppel, in two instances: "One is where the debtor lacks knowledge of the factual basis of the undisclosed claims, and the other is where the debtor has no  motive for concealment." <u>Tennyson</u>, 313 B.R. at 407. The court concluded that

neither circumstance was established because the plaintiffs were aware of the claims and simply failed to list them on their schedules or amended bankruptcy schedules and the plaintiffs had a motive for failing to list the claims, namely, the plaintiffs, rather than their estate, would receive the benefit of any monetary award.  See id.

In Eubanks v. CBSK Financial Group, Inc., 385 F.3d 894 (6th Cir. 2004), the Sixth Circuit declined to apply judicial estoppel, even where the plaintiffs failed to list their lender-liability claim against the defendant on their schedules and failed to schedule the defendant as a creditor or potential claimant.  The plaintiffs informed the trustee of their claim in a meeting of creditors.  Pursuant to the trustee's instructions, the plaintiffs' attorney provided the trustee information concerning the claim.  Thereafter, the plaintiffs asked the trustee on several occasions to advise them whether or not he intended to pursue the claim on behalf of the estate, but the trustee failed to give them a definitive answer.  The plaintiffs then moved the bankruptcy court for a status conference regarding their lender-liability claim, but the bankruptcy court dismissed the request as moot after the trustee filed a report stating that there was no property available for distribution and the estate had been fully administered.  On December 2, 1999, the final decree in the bankruptcy case was issued.  Subsequently, the plaintiffs filed their lender-liability claim in state court, and the defendant removed it to federal district court on the basis of bankruptcy jurisdiction and diversity jurisdiction. The defendant filed a motion to dismiss on the basis of judicial estoppel, and, after a hearing on the motion, the district court directed the trustee to file a motion to abandon the claim and it indicated that it would remand the case to state court after the trustee filed the motion.  The plaintiffs then moved to substitute the trustee as the plaintiff in the civil action after the trustee refused to abandon the claim.  The plaintiffs also filed an amendment to their original bankruptcy petition to add their

12

claim against the defendant. The bankruptcy court entered the trustee's final report on January 29, 2002, which declared the plaintiffs' lender-liability claim fully administered, and the district court thereafter dismissed the case on the grounds of judicial estoppel. On appeal, the Sixth Circuit held that the district court erred in applying judicial estoppel, even though the plaintiffs had knowledge of their claim during the bankruptcy proceeding, because the plaintiffs' actions showed that they had no motive or intent to conceal the claim since they made numerous attempts to advise the trustee and the court of their claim. Id. at 897. The court observed:

> There is record evidence in the case that Plaintiffs made the court, and the Trustee, aware of the potential civil claim against Defendant before the bankruptcy action closed, although the claim was omitted from Plaintiffs' bankruptcy schedule form. Plaintiffs' counsel and the trustee were in contact, with respect to the documentation regarding the claim against Defendant, prior to the filing of the Trustee's Final Report. When Plaintiffs' counsel could not confirm whether or not the Trustee intended to reconcile the civil claim through the bankruptcy proceeding, Plaintiffs attempted to resolve the issue through a court conference, which was eventually cancelled due to the filing of the Trustee's Final Report.
> . . . .
> The record established that Plaintiffs amended the bankruptcy schedules once, and attempted to amend it a second time, to finally place Defendant on the schedule as a creditor and potential asset. Defendant, however, provides no additional evidence that Plaintiffs demonstrated fraudulent intentions towards the court. Additionally, the record establishes that Plaintiffs put the court and the Trustee on notice through correspondence, motions, and status conference requests, thus supporting the argument that the claim's omission on the schedules was merely inadvertent, particularly since Plaintiffs' desire to pursue a liability claim against Defendant was a fact known by all parties involved.

Id. at 898-99.

To the extent that there is even an argument for the application of judicial estoppel in this case, the facts here are similar to those in Eubanks, and in fact provide an even stronger justification for not applying judicial estoppel. First, with regard to the Moores' representations regarding the sale of their property to Cycon and the lease back from Cycon, the Court notes that at the time

13

Plaintiffs filed their bankruptcy case, those representations were consistent with what the documents provided, as no court had yet declared that the transaction was an equitable mortgage. Moreover, those representations are consistent with what the Moores have alleged in this case, except that in this case, in which they seek rescission, they are also alleging that the transaction was, in reality, a refinancing rather than an outright sale. As the Second Circuit has noted, "[i]f the statements [in the two proceedings] can be reconciled there is no occasion to apply an estoppel." Simon v. Safelite Glass Corp., 128 F.3d 68, 73 (2d Cir. 1997). Second, although the Moores did not specifically identify TILA or HOEPA claims or identify Cycon as a defendant in their bankruptcy schedules, they did indicate that their fraud and conversion claims would be against other undetermined parties, which could have included Cycon. Third, as set forth above, in connection with his request to abandon the claims, the Moores' counsel provided the trustee with a detailed explanation of the claims and explained that the claims would be based upon the legal theory that the transaction was an equitable mortgage. See Lewis v. Weyerhaeuser Co., 141 F. App'x 420, 426-27 (6th Cir. 2005) (stating that "under Eubanks, even if the debtor has knowledge of a potential cause of action and a motive to conceal it, if the plaintiff does not actually conceal it and instead takes affirmative steps to fully inform the trustee and the bankruptcy court of the action, it is highly unlikely that the omission in the bankruptcy petition was intentional. In such a case, the equitable principles governing judicial estoppel do not support its application"). Finally, after full disclosure from the Moores and upon notice issued to all parties and approval of the bankruptcy court, the Trustee abandoned the claims before the Moores received their discharge. Thus, the Moores did not persuade the bankruptcy court to adopt any position that is contrary to what they assert in this case. As in Eubanks, the facts in this case show that the Moores had no intent or motive to conceal their

claims because they made full disclosure to the trustee and obtained an abandonment of those claims before pursuing the instant litigation. Accordingly, judicial estoppel has no application in this case.

### 2. Sale Versus "Equitable Mortgage"

The heart of this case is the determination of whether the transaction between the Moores and Cycon was a true sale and leaseback or whether it was in reality a loan. Cycon has offered a number of arguments supporting its position that the transaction was clearly an absolute sale and a leaseback, including: (1) the unambiguous terms of the closing documents establish that the Moores intended to sell their property to Cycon and lease it back from Cycon; (2) the Moores failed to read the closing documents and are therefore bound by the terms of those documents; (3) the parol evidence rule precludes the consideration of evidence of prior discussions between the Moores and Peltz as well as evidence of the Moores' intentions regarding the transaction; and (4) the integration clause in the lease precludes the Moores from introducing evidence of their intentions regarding the lease.

While Cycon's arguments would no doubt be fine, and certainly persuasive, grounds for summary judgment in a typical contract case, the Moores have invoked Michigan's "equitable mortgage" doctrine in this case, as to which such arguments are not necessarily applicable. "The power of a court of equity to decree an equitable mortgage under proper circumstances and to construe an instrument in the form of an absolute conveyance as security for the payment of a debt, or the performance of some other obligation, is well established." Judd v. Carnegie, 324 Mich. 583, 587, 37 N.W.2d 558, 589 (1949). See also Grant v. Van Reken, 71 Mich. App. 121, 125, 246 N.W.2d 348, 350 (1976) ("It is well settled that a court of equity can declare a deed absolute on its face to be a mortgage."). In Wilcox v. Moore, 354 Mich. 499, 93 N.W.2d 288 (1958), the Michigan Supreme Court, in discussing the doctrine, observed:

> Suffice to say that its purpose is to protect the necessitous borrower from extortion. In the accomplishment of this purpose a court must look squarely at the real nature of the transaction, thus avoiding, so far as lies within its power, the betrayal of justice by the cloak of words, the contrivances of form, or the paper tigers of the crafty. We are interested not in form or color but in nature and substance.

Id. at 504, 93 N.W.2d at 291. Because a court is concerned with the true intention of the parties based upon the surrounding circumstances in considering whether a transaction is an equitable mortgage, traditional legal principles, such as the parol evidence rule, do not apply. See Ferd L. Alpert Indus., Inc. v. Oakland Metal Stamping Co., 379 Mich. 272, 276, 150 N.W.2d 765, 767 (1967) ("One of the many exceptions to the parol evidence rule is that parol evidence may be admitted to prove that a written conveyance absolute in its terms was intended by the parties to operate only as a mortgage."). Moreover, "[w]hile fraud or mistake are essential elements of a cause of action for reformation, rescission or cancellation of a written conveyance, they are not essential to a cause seeking to establish that a conveyance absolute in form is in fact a mortgage." Id. at 276-77, 150 N.W.2d at 767 (citation omitted). However, "one who asserts that an absolute conveyance is a mortgage bears a heavy burden of proof and he who invokes this equitable doctrine must furnish a preponderance of evidence whereby it is made 'very clear' to the fact finder that the parties did not contemplate an absolute sale." Grant, 71 Mich. App. at 126, 246 N.W.2d at 350.

Although there is no precise test for determining when an equitable mortgage should be imposed, the controlling factor is the intention of the parties. See Alber v. Bradley, 321 Mich. 255, 262, 32 N.W.2d 454, 457 (1948). "Such intention may be gathered from the circumstances attending the transaction including the conduct and relative economic positions of the parties and the value of the property in relation to the price fixed in the alleged sale." Koenig v. Van Reken, 89 Mich. App. 102, 106, 279 N.W.2d 590, 592 (1979) (citing 59 C.J.S. Mortgages §§ 35, 36). Proof of the grantor's

adverse financial condition, along with inadequacy of the purchase price, is generally sufficient to establish that a deed absolute on its face is actually a mortgage.  See Grant, 71 Mich. App. at 127, 246 N.W.2d at 350-51.  Other factors indicating that a transaction is really a mortgage are the grantor's continued possession or improvement of the property and payment of taxes and insurance. See Alber, 321 Mich. at 262-63, 32 N.W.2d at 457.  With these considerations in mind, the Court will examine the circumstances surrounding the transaction.

### a.     The Moores' Financial Situation

It is undisputed that when Peltz contacted the Moores, they were in a difficult financial situation and were desperate to avoid losing their home and equity through foreclosure.  Given the fact that Peltz contacted the Moores shortly after the information regarding the foreclosure was published, it is obvious that Peltz knew that the Moores were in a tough position and would likely be willing to consider almost any type of financing in order to save their home.  In fact, Mr. Moore testified that at the closing he was too glad to obtain refinancing to question anybody about anything.

### b.     The Parties' Understanding of the Transaction

Both Mr. and Mrs. Moore testified that Peltz solicited them for the purpose of providing refinancing and that in all conversations and meetings they had with Peltz, including the closing, Peltz confirmed that the transaction was a refinancing.  This evidence is unrebutted.  In addition, as far as Cycon's understanding of the transaction, Windham testified in his deposition that when St. John contacted him about the investment, he asked Windham whether he was interested in taking a mortgage on it.[2]  Finally, in the St. John affidavit submitted by B & P in support of its motion for

---

[2]Cycon has submitted two affidavits from Windham in which Windham states that Cycon never intended to loan money to the Moores and was purchasing the property and that in Windham's initial conversation with St. John, St. John told him that the Moores were selling their property because they could not qualify for financing.  It is well established in the Sixth Circuit that a party may not create a genuine issue of material fact by filing an affidavit that contradicts his

summary judgment, St. John states that he contacted Windham to inquire whether Cycon would be interested in engaging in a "hard money" refinancing, since the Moores "were not able to qualify for conventional refinancing." (St. John Aff. ¶¶ 4-6.) As additional support, the Moores have submitted a letter dated July 16, 2003, that they received from Windham on behalf of L & B, Windham's company that managed the Moores' property, stating: "Your mortgage agreement with our firm requires monthly payments be made by the 5th day of each month," and "It is very important to remember that payments received past the 30th day of the month the payment is due *automatically* places your mortgage in *default*." (Letter from L & B Investors, LLC of 7/16/03.) Cycon has submitted an affidavit from Windham in which he admits that L & B manages the property at issue in this case, but states that if the letter was in fact sent, it was sent by mistake because neither Cycon nor L & B entered into a mortgage agreement with the Moores and there was no reason to send the letter because the Moores were not behind in their rent. (Windham 5/8/06 Aff. ¶ 6.) However, as noted above, Windham testified in his deposition that St. John presented the transaction as a mortgage and, contrary to Windham's characterization, the letter says nothing about the recipient being in default. Rather, the letter merely reminds that mortgagor of the importance of making timely mortgage payments.

Cycon argues in its motion that the Moores are precluded from arguing that the transaction was a refinancing rather than a sale because their bankruptcy attorney, in a letter to the title company dated July 18, 2003, referred to the transaction as a "sale" and stated that the Moores "incurred no

---

prior deposition testimony. See Reid v. Sears, Roebuck & Co., 790 F.2d 453 (6th Cir. 1986). In Reid, the Sixth Circuit found that the district court properly refused to find a genuine issue of material fact on the basis of an affidavit submitted by the plaintiff which contradicted her earlier deposition testimony that the defendant had not promised during an interview that the plaintiff did not have to worry about being laid off. Id. at 459-60. This is precisely the situation here. Accordingly, the Court will not permit Cycon to create an issue of fact by contradicting Windham's prior deposition testimony by means of a subsequent affidavit.

indebtedness and undertook no mortgage obligation." (Letter from Stariha to Unified Title of 7/18/03.) Contrary to Cycon's argument, however, a fair reading of the letter is that the Moores' counsel was not taking a position that the transaction was, in fact, a sale rather than an equitable mortgage. Rather, the letter shows that he was questioning why, when the Moores supposedly incurred no indebtedness and sold their property to Cycon, they were charged over $23,000 in loan origination charges – a legitimate question, especially considering that the Moores did not receive a single penney for their property.

### c.     The Closing Documents

Cycon argues that the documents relating to the transaction, including the purchase agreement, the deed, and the lease, conclusively establish that the transaction was a sale. But, as noted above, the doctrine of equitable mortgage looks to the substance, not the form, of the transaction. While the transaction was structured as a sale and a leaseback, the lease contained many features that are inconsistent with a residential lease, in that it imposed many of the obligations usually borne by the property owner upon the Moores as lessees. For example, the Moores were required to pay all real estate taxes, assessments, water charges, and personal property taxes; they were responsible for maintaining all insurances, including public liability insurance protecting Cycon (as would be the case in a typical mortgage arrangement), and they were responsible for paying for repairs and maintenance. Thus, the obligations imposed on the Moores under the lease make the transaction look more like a home mortgage rather than a sale of a home.

Apart from the lease, the settlement statement that Peltz provided to the Moores speaks volumes. In particular, it shows that B & P received $12,930 as a loan origination fee and $350 as

an underwriting fee and that Peltz received $9,420 as an additional settlement charge.  If, in fact, the transaction was a sale, there would be no reason to charge such fees.

### d.  The Consideration

The Moores contend that the consideration was grossly inadequate.  Relying upon the Fox appraisal, they contend that the property had a fair market value of $307,900 in June 2003, and the Moores received only $190,262.15 for the property, leaving Cycon with approximately $117,637.85 of the Moores' equity.  In addition, the Moores cite Windham's testimony that he relied upon the Fox appraisal in deciding to enter into the transaction and that his rule of thumb was to discount the appraisal by 20% to give a "worst case" sale figure for the property.  (Windham Dep. at 54-55.)  The Moores argue that even under Windham's "worst case" scenario, the property had a fair market value of $246,320.00.

On the other hand, Cycon contends that the Moores' figures are erroneous because it actually paid $215,500 for the property rather than $190,262, as the Moores suggest.  Cycon further argues that the Fox appraisal does not support the Moores' contention that the property had a fair market value of $307,900 because the appraisal states that the home is built on 16 acres, when in fact it is located on only 7.8 acres and the separate parcel consisting of 8.8 acres was not conveyed to Cycon. Rather, Cycon contends, based upon an appraisal performed by Thayer I. Hunt, Inc. in February 2006, the property had a fair market value in March 2003 of $231,500.  Cycon argues that based upon the Hunt appraisal, the purchase price was adequate, regardless of whether the purchase price is considered to be $215,500 (the amount Cycon paid) or $190,262 (the mortgage payoff) because under the former scenario it paid approximately 93% of the fair market value and under the latter scenario it paid approximately 82% of the fair market value.  Cycon contends that neither of these

percentages is grossly inadequate under <u>Schultz v. Schultz</u>, 117 Mich. App. 454, 324 N.W.2d 48 (1982), where the court held that a purchase price of between 70% and 85% of the property's fair market value was not inadequate.

As noted above, if the transaction was not in fact a loan, there would be no reason for the Moores to pay substantial charges associated with a loan. Thus, the Court finds it appropriate to use the mortgage payoff of $190,262 as the purchase price. Using the $231,500 from the Hunt appraisal as the fair market value of the property at the time of the transaction, the Moores' equity was still approximately $41,000. Even if the purchase price is not considered grossly inadequate, it is still true that the Moores parted with their property for substantially less than would have been the case in a true sale. The Court does not find <u>Schultz</u> dispositive of the issue, because that case involved a transaction between two brothers, was not a transaction between a creditor and a debtor, and the plaintiff-transferor had testified that he "needed the property just as well as [he] needed a hole in [his] head." <u>Id.</u> at 460, 324 N.W.2d at 51. Finally, the Court notes that Cycon's third-party claim that it relied on the representation in the Fox appraisal that the Moores' property contained 16 acres actually supports the conclusion that the transaction was an equitable mortgage, because if what Cycon alleges is true, it obviously believed that it was obtaining property worth substantially more than the amount it paid.

**e.     The Parties' Conduct After the Transaction**

Cycon argues that the Moores' conduct with respect to the property following the closing is inconsistent with Plaintiffs' claim of ownership in the property. Cycon points out that the Moores did not pay the property taxes or the insurance on the property, but rather left it up to Cycon to pay these charges. While it may be true that Cycon performed these obligations, it is also true, as noted

21

above, that the lease obligated the Moores to pay the taxes and insurance and to maintain and repair the property.  The performance of such obligations normally indicates an ownership interest.  <u>See</u> <u>Alber</u>, 321 Mich. at 263, 32 N.W.2d at 457.  The fact that the Moores failed to pay for such things simply shows that they breached their obligations, which, under either a lease or a mortgage, would constitute a default.

Based upon the foregoing considerations, the Court concludes that there is no genuine dispute as to any issue of material fact and that the Moores have established by clear evidence that the transaction was not intended to be an absolute sale, but rather was a financing arrangement.  That is, there is no dispute that the Moores were in a precarious financial position and needed financing in order to save their property from foreclosure.  It is also undisputed that, in all of their dealings with Peltz, it was always understood that the transaction was considered a refinancing and the evidence shows that Windham understood the deal to be a mortgage.  In fact, there is no evidence that the Moores ever contemplated selling their property.  Bolstering this point even further is the fact that the Moores paid over $23,000 in loan-related fees to B & P and Peltz when no loan was purportedly made.  In addition, even though there was not a gross disparity between the  fair market value of the property and the amount the Moores received ($190,262 for the mortgage payoff), they nonetheless gave up approximately $41,000 in equity, which is not insubstantial by any measure. Finally, the fact that the Moores remained liable for property taxes, insurance, and maintenance and repair charges, as they had been prior to the transaction, is further evidence showing that the transaction was in fact a mortgage.  <u>See</u> <u>Grant v. Van Reken</u>, 71 Mich. App. 121, 246 N.W.2d 348, (1976)125-28, 246 N.W.2d at 350-51 (1976) (concluding that the plaintiffs met their heavy burden of proof where the evidence showed that the plaintiffs sought refinancing in order to avoid

foreclosure, they signed documents prepared by the defendant, and they received nothing for their property while the defendant received a property worth $25,000, encumbered by a $9000 mortgage, by paying only $2300).  Therefore, the Court concludes that Cycon acquired an equitable interest in the Moores' property.

### 3.       The Moores' TILA, HOEPA, and Usury Claims

The Moores have moved for summary judgment on their TILA, HOEPA, and Usury claims based upon the grounds that the transaction was actually a loan and a consumer transaction for purposes of the TILA and that the transaction was a "high rate" mortgage within the meaning of HOEPA.  The Moores also contend that because the Moores would have had to pay Cycon $2,515 plus a lump sum of $224,120 in order to repurchase their property in the first thirty days, Cycon charged the Moores interest in the amount of $36,372.85 on a loan in the principal amount of $190,262.15, in violation of the rate allowed by M.C.L. 438.31c.  Cycon's sole argument with respect to these claims is that the transaction was a sale and leaseback, and not a loan.  Because the Court has concluded that the transaction was actually an equitable mortgage, and Cycon offers no other reason why the Moores are not entitled to summary judgment on these claims, the Court concludes that the Moores have established that Cycon violated these laws and that the Moores are entitled to relief.

### 4.       The MCSPA Claim

In Count 7 of their complaint, the Moores allege that Cycon violated the MCSPA, which among other things, prohibits a credit services organization and others from making or using "a false or misleading representation in the offer or sale of the services of a credit organization."  M.C.L.A. § 445.1823(d).  Cycon contends that it is entitled to summary judgment on this claim because: (1)

the transaction was not a credit transaction; and (2) Cycon did not make any misrepresentations to the Moores in connection with the transaction.  Because the Court has already rejected the first ground for the reasons discussed above, the only issue is whether Cycon made any misrepresentations to the Moores.

Cycon argues that it is undisputed that Cycon had no communications with the Moores prior to the closing of the transaction and that all of the communications giving rise to the alleged false and misleading misrepresentations were between Peltz and the Moores.  Cycon notes that its sole interaction with the Moores was a brief exchange of pleasantries between Windham and the Moores when he inspected their property.  Cycon further notes that Mr. Moore testified that he believed that Peltz worked for Palmer Mortgage and not Cycon.  (Samuel Moore Dep. at 75.)

The Moores contend that summary judgment would be inappropriate because a jury could reasonably conclude that Peltz was acting as Cycon's agent because Windham testified that St. John told him that the investment opportunity was being arranged by Peltz.  Alternatively, the Moores contend that even if Peltz was not Cycon's agent, Cycon made misrepresentations in the closing documents.  In particular, the Moores note that the warranty deed states that it was prepared by Cycon, and that a jury could reasonably conclude that Cycon misrepresented the transaction to the Moores by having them sign closing documents styled as a sale with a leaseback when in fact the transaction was a loan.

"Generally, in a dispute as to the question of agency, if there is any testimony tending to establish agency, a question of fact is present for the jury to determine."  Head v. Benjamin Rich Realty Co., 55 Mich. App. 348, 357, 222 N.W.2d 237, 242 (1974).  In this case, the Court concludes that there is sufficient evidence to create a genuine issue with regard to whether Peltz was acting as

24

an agent on behalf of Cycon in the transaction. As indicated above, Cycon understood that Peltz was arranging the transaction and Peltz, alone, closed the transaction without anyone present from Cycon or B & P. Although the evidence is not overwhelming, the Court will deny Cycon's motion on this claim because there is sufficient evidence to allow a jury to conclude that Peltz was acting on behalf of Cycon.

**B.      Cycon's Counter-claim**

Cycon has requested summary judgment on its counter-claim for breach of the lease. Because the Court has concluded that the transaction was actually an equitable mortgage, it will deny Cycon's motion for summary judgment because the lease is invalid. In addition, because the law of usury applies when a court imposes an equitable mortgage, see Grant, 71 Mich. App. at 128-29, 246 N.W.2d at 251, Cycon may not recover any interest, delinquency charges, attorney fees, or other charges. See id. However, because the Moores would be required to pay the property taxes and insurance under a mortgage, the Court finds no reason why Cycon is not entitled to recover those amounts it paid on the Moores' behalf.

**C.      B & P's Motion for Summary Judgment**

Cycon has asserted two cross-claims against B & P, which, in light of the procedural developments in this case, have now been recharacterized as third-party claims. Cycon asserts claims of promissory estoppel and misrepresentation against B & P. In particular, Cycon alleges that B & P made the following two promises/representations, which were both false and constituted material facts upon which Cycon relied in entering into the transaction: (1) that the Fox appraisal falsely stated that the Moores' property (on which the house was built) included over 16 acres, when in fact it only included approximately six or seven acres; and (2) that the transaction had been

adequately explained to the Moores and that they understood the nature of the transaction as a sale and leaseback rather than as a refinancing. B & P contends that it is entitled to summary judgment on Cycon's claim based upon the representation/promise regarding the Moores' understanding of the transaction because: (1) Cycon can produce no evidence showing that B & P made any statement that it knew was false or with reckless disregard for its truth; (2) Cycon cannot show reasonable reliance on any statement by St. John on behalf of B & P because St. John informed Windham that no one from B & P had been in contact with the Moores and that all of the information he had regarding the Moores' understanding came from Peltz; (3) Windham could have confirmed with the Moores their understanding of the transaction when he met them at their property to conduct his inspection and when he saw them at the title company shortly before the closing; and (4) there is no proof of an "actual, clear, and definite" promise by B & P regarding the Moores' understanding. B & P contends that it is entitled to summary judgment regarding the representation/promise that the property consisted of 16 acres because: (1) the Moores provided the information concerning the acreage for the Fox appraisal and they never disclosed to Ms. Fox that their home was built upon a separate seven-acre parcel; (2) B & P was simply a conduit of information that it received from Peltz, and it never made any representations as to the accuracy of the Fox appraisal; (3) Cycon cannot show that B & P made any misrepresentation about the Fox appraisal with knowledge that it was false or with reckless disregard for the truth; (4) Cycon had the means to discover the actual acreage of the property but failed to utilize such means; and (5) providing Cycon a "package" of documents cannot constitute an "actual, clear and definite" promise required to support a promissory estoppel claim. Finally, B & P asserts that Cycon may not maintain an a third-party action against it for

indemnification or contribution on the Moores' TILA and HOEPA claims, as well as their state law claims.

### 1.    Factual Assertions

In support of its motion, B & P has submitted an affidavit from St. John, a principal of B & P and the only representative of B & P who had any contact with Cycon or Windham regarding the transaction at issue. St. John states that Peltz contacted him regarding the Moores, explaining that their property had been sold in foreclosure and they were unable to obtain conventional refinancing. (St. John Aff. ¶ 4.) St. John states that Peltz inquired whether B & P could find an investor that would be willing to enter into a so-called "hard money" refinancing transaction with the Moores. (Id.) Following that conversation, Peltz provided St. John the file that Peltz and/or Palmer Home Mortgage had assembled on the Moores' proposed refinancing, which contained a copy of the Fox appraisal dated February 14, 2003. (Id. ¶ 5.) St. John states that after receiving the file from Peltz, he contacted Windham to determine whether he was interested in investing in the Moores' property. (Id. ¶ 6.) Windham indicated an interest in the transaction, and St. John sent Windham a copy of the file that he had received from Peltz. St. John states that he identified the file as Peltz' creation, that he told Windham that he did not have any personal knowledge about its contents, and that he did not at any time represent to Windham that the Moores' property consisted of "16 acres, more or less," as stated in the Fox appraisal. (Id. ¶ 7.) Finally, St. John states that Cycon's attorney drafted the lease agreement and delivered it to Peltz,[3] and that:

---

[3]This assertion is consistent with Windham's statement in his May 8, 2006, affidavit, in which he states that Cycon's attorney prepared the lease agreement and delivered it to Peltz. (Windham 5/8/06 Aff. ¶ 4.) The Court notes that in a subsequent affidavit dated May 15, 2006, which Cycon submitted in opposition to B & P's motion, Windham stated that the lease was delivered to B & P. (Windham 5/15/06 Aff. ¶ 5.)

I was subsequently informed by Mr. Peltz that he had delivered a copy of the Lease, among other documents, to the Moores and that he had reviewed the documents with them in detail.  Mr. Peltz told me that the Moores fully understood the transaction into which they were entering with Cycon and that they had no reservations about proceeding with it.  I relayed the information I received from Mr. Peltz to Mr. Windham and, in doing so, I specifically stated to Mr. Windham that all of the information I had came from Mr. Peltz.  I told Mr. Windham that I had had no personal contact with the Moores and that I had no first hand knowledge of their conversations with Mr. Peltz.

(Id. ¶ 9.)

B & P also points out, and Cycon does not dispute, that the Moores arranged for Ms. Fox to perform her appraisal in connection with the Moores' efforts to obtain refinancing at or around the time of the foreclosure sale.  It is also undisputed that Mr. Moore provided the property description information to Ms. Fox, upon which she mistakenly assumed that the property on which the house was built included the entire 16 acres, and Mr. Moore never informed Ms. Fox that her assumption was incorrect.  B & P further notes that Windham testified in his deposition that St. John told him at some point after their initial telephone conversation regarding the Moores' property that he (St. John) became aware that the Moores' property might be available through Peltz.  (Windham Dep. at 50.)  B & P also notes that in determining whether to enter into the transaction, Cycon, through Windham, did not rely upon any general summary of the appraisal that St. John may have provided, but instead, relied upon its own interpretation of the Fox appraisal.  Thus, B & P points out, Windham did not take the Fox appraisal at face value, but instead applied his own analysis, as shown by Windham's testimony that he applied his "rule of thumb" 20% discount to the valuation.  (Id. at 55.)

In opposition to B & P's motion, Cycon has submitted Windham's affidavit, which disputes several facts set forth in St. John's affidavit.  In his affidavit, Windham admits that St. John told him

that B & P first learned of the Moores' property through Peltz, but he states that St. John never told

him that he had no personal contact with the Moores or that he had no personal knowledge about the

property.  (Windham 5/15/06 Aff. ¶ 4.)  Windham also confirms that he received a file from B & P

containing a credit report and the Fox appraisal, which stated that the property consisted of 16 acres,

and that St. John never indicated that Peltz created the file, nor did he disclose the fact that he had

no knowledge regarding the accuracy of the information in the file.  (Id. ¶ 3.)  Windham further

states that he assumed that B & P confirmed the accuracy of the information that it provided to him

"[b]ecause B & P is in the business of brokering real estate transactions such as the transaction at

issue in the present case."  (Id.)  With regard to the Moores' understanding of the transaction,

Windham states:

> Cycon's attorney, Douglas J. Brackman, prepared a lease/purchase option
> agreement which allowed the Plaintiffs to remain in possession of the house and copy
> [sic] of the lease was delivered to B & P. . . .  Mr. St. John promised me that
> Plaintiffs understood that Cycon was purchasing the property and leasing it back to
> them.  Mr. St. John and I never discussed the basis for his knowledge of the Plaintiffs
> [sic] understanding of the transaction and I was never told that Mr. St. John was
> simply relaying this information based on what he had been told by Mr. Peltz.

(Id. ¶ 5.)  Windham also states that Cycon relied on B & P's promise that the Moores fully

understood the transaction and that, without a promise that the transaction had been explained to the

Moores and that they fully understood that they were selling the property to Cycon and leasing it

back, Cycon would not have gone through with the transaction.  (Id. ¶ 9.)  Finally, in opposing B &

P's motion, Cycon relies upon Windham's deposition testimony that St. John "gave a brief

description of the property, 16 plus acres, 2500 square foot or so of home, that from what he could

see it was a nice home."  (Windham Dep. at 50.)

### 2.     Elements of Promissory Estoppel and Misrepresentation Claims

In order to establish a claim of promissory estoppel, a plaintiff must allege that: (1) the defendant made a promise; (2) the defendant should have reasonably expected to induce definite and substantial action or inaction by the plaintiff; (3) the plaintiff in fact relied on the promise; and (4) the circumstances require enforcement of the promise in order to avoid injustice.  See Estate of Ardt v. Titan Ins. Co., 233 Mich. App. 685, 692, 593 N.W.2d 215, 219 (1999).  A court must "exercise caution in evaluating an estoppel claim and should apply the doctrine only where the facts are unquestionable and the wrong to be prevented undoubted." Novak v. Nationwide Mut. Ins. Co., 235 Mich. App. 675, 687, 599 N.W.2d 546, 552 (1999).  To support a claim of estoppel, a promise must be definite and clear.  See Barber v. SMH (US), Inc., 202 Mich. App. 366, 76, 509 N.W.2d 791, 797 (1983) (per curiam).

The elements of a misrepresentation claim are: (1) the defendant made a material representation; (2) the representation was false; (3) when the defendant made the representation, the defendant knew that it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) the defendant made the representation with the intention that the plaintiff would act upon it; (5) the plaintiff acted in reliance upon it; and (6) the plaintiff suffered damage. Kassab v. Mich. Basic Prop. Ins. Ass'n, 441 Mich. 433, 442, 491 N.W.2d 545, 548 (1992).

### 3.     Cycon's Claim Regarding The Moores' Understanding

Cycon's argument that it would not have entered into the transaction without B & P's promise that the transaction had been adequately explained to the Moores and that the Moores understood the transaction, as well as B & P's arguments in support of its motion on this claim, demonstrate a lack of understanding of the equitable mortgage doctrine and the Moores' claims.

That is, the Moores do not claim that they were misled or "tricked," as B & P asserts, regarding the transaction or that they did not understand the transaction.  As noted above, such allegations are not necessary in order to invoke the doctrine: "While fraud or mistake are essential elements of a cause of action for reformation, rescission or cancellation of a written conveyance, they are not essential to a cause seeking to establish that a conveyance absolute in form is in fact a mortgage." Ferd L. Alpert Indus., 379 Mich. at 276-77, 150 N.W.2d at 767 (citation omitted).  As Michigan courts have repeatedly stated, "an instrument in the form of an absolute deed of conveyance may be construed as a mortgage if given as security." Alber, 321 Mich. at 262, 32 N.W.2d at 457.  Regardless of whether or not Peltz actually explained the transaction to the Moores as a sale and a leaseback, Cycon would find itself in the position of being an equitable mortgagee.  Thus, given the circumstances surrounding the transaction, Cycon's reliance upon B & P's representation that the transaction had been explained to the Moores and that they understood the transaction is immaterial.

In any event, B & P is entitled to summary judgment on this claim for two other reasons. First, the Court has already concluded above, based upon the Moores' testimony that the deal was a refinancing, St. John's statement that the transaction was a "hard money" transaction as an alternative to "conventional refinancing," Windham's testimony that the deal was a mortgage, and other evidence, that the transaction was intended as a mortgage rather than as an absolute sale. Therefore, the Moores' testimony that Peltz confirmed to them that the transaction was a refinancing shows that the Moores fully understood the nature of the transaction as involving a loan and mortgage and not a sale.[4]  Second, Cycon has not presented any evidence showing that Peltz did not

---

[4]Cycon's complaint is, or should be, that no one explained to Cycon that regardless of the form of the transaction, it was in substance a mortgage.  Cycon does not argue, and the Court would not conclude, that B & P – a mortgage broker – had any obligation to explain the legal import of the transaction to Cycon.

explain the documents to the Moores.  St. John states in his affidavit that Peltz told him that the Moores fully understood the transaction and that he relayed this information to Windham.  (St. John Aff. ¶ 9.)  Windham states in his affidavit that St. John promised him that the Moores understood that Cycon was purchasing the property and leasing it back to them.  (Windham 5/15/06 Aff. ¶ 5.)  Cycon has not presented any evidence that Peltz did not explain to the Moores the form of the transaction (sale and leaseback) or that they did not understand it.  Thus, Cycon cannot succeed on this claim.

### 4.    Cycon's Claim Regarding The Acreage Of The Property

B & P cites several reasons for granting summary judgment on this claim, but the Court finds one reason in particular sufficient to support summary judgment.  That is, Cycon has failed to present any evidence that B & P or St. John knew that the statement in the Fox appraisal that the property contained 16 acres was false, or that St. John recklessly made such a statement.  Windham conceded in his deposition that St. John told him that B & P learned of the Moores' property through Peltz.  B & P has presented evidence, which is undisputed, that the file it sent to Windham was created and furnished by Peltz.  Although Windham states in his affidavit that St. John never identified the file as coming from Peltz, Windham does not state that St. John told him that the file was created by B & P, and any understanding Windham had to that affect was apparently based upon his own assumption.  Moreover, as B & P notes, a reasonable person in Windham's position could have easily determined, by reviewing the appraisal and the file, that B & P was not the source of the information in the Fox appraisal and that the file originated with Peltz.  That is, the Fox appraisal showed that its effective date was November 28, 2002 – before the foreclosure of the Moores' property – and the "Lender/Client" was identified as "Home Equity Loan Products."  In addition, the

credit report stated that it was "Prepared For Palmer Home Mortgage," not B & P.  Moreover, even accepting as true Windham's testimony that St. John said that the property included "16 plus acres," St. John was merely repeating information from the Fox appraisal, which Peltz had provided to him and which was based upon information that the Moores had provided to Fox.  Cycon has provided no evidence showing that B & P or St. John knew or should have known that the statement in the Fox appraisal was false, nor has it provided any explanation why B & P or St. John acted recklessly in repeating that information to Windham.[5]  Moreover, Cycon, whether as a purchaser or a lender, could have easily discovered the flaw in the Fox appraisal by obtaining a survey and/or title insurance policy, as is the customary practice in transactions of this nature.  Accordingly, this claim also fails.

### 5.    Availability of Indemnification or Contribution

B & P also contends that Cycon may not maintain claims against it for contribution and indemnity on the Moores' TILA and HOEPA claims, as well as on their state law claims.  Although Cycon concedes that it may not maintain claims for contribution and indemnity on the Moores' federal claims, the Court finds no need to address the issue of whether such claims are available with regard to the Moores' state law claims, because Cycon did not allege any claim for contribution or indemnity against B & P.  Rather, Cycon's sole claim for indemnification was against Peltz and Palmer.

---

[5]Cycon cites the case of <u>Williams v. Polgar</u>, 391 Mich. 6, 215 N.W.2d 149 (1974), for the proposition that "B & P had a duty to either verify the accuracy of the appraisal before giving it to Cycon or expressly disclaim any knowledge as to its accuracy" (Cycon's Br. Opp'n B & P's Mot. at 13), but <u>Williams</u> involved a claim of negligent misrepresentation by an abstracter.  The claim here is a fraudulent misrepresentation claim, and <u>Williams</u> provides no support for the proposition that a mortgage broker owes a duty to a lender, such as Cycon, to confirm the accuracy of an appraisal that was prepared without input from the mortgage broker.

## V.  <u>Conclusion</u>

For the foregoing reasons, the Court concludes that the Moores have shown that there is no genuine issue of material fact that the transaction with Cycon was a mortgage under the equitable mortgage doctrine and not a sale of their property.  Accordingly, the Court will grant the Moores' motion for partial summary judgment and deny Cycon's motion for summary judgment.  The Court will also grant B & P's motion for summary judgment because there is no basis for Cycon's third-party claims of promissory estoppel and misrepresentation against B & P.


Dated:  August 16, 2006                                     /s/ Gordon J. Quist
                                                                      GORDON J. QUIST
                                                                      UNITED STATES DISTRICT JUDGE